**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                                :
JOHNNIE DAVENPORT,              :
                                :   Civil Action No. 09-4997 (MLC)
       Petitioner,             :
                                :        O P I N I O N
       v.                      :
                                :
MICHELLE R. RICCI, et al.,     :
                                :
       Respondents.            :
_____ :
```

**COOPER, District Judge**

Petitioner, Johnnie Davenport ("Davenport"), a convicted state prisoner confined at New Jersey State Prison, petitions for a writ of habeas corpus challenging his New Jersey state court judgment of conviction entered on or about May 28, 1999.  See 28 U.S.C. § 2254.  The petition will be denied.

**I.  BACKGROUND**

**A.  Procedural History**

On September 8, 1997, a Monmouth County Grand Jury indicted Davenport on 25 counts, including: first degree offense of being the leader of a narcotics trafficking network, first degree; third degree possession of cocaine; second degree possession of cocaine with intent to distribute; second and third degree possession of a weapon for an unlawful purpose; fourth degree acquiring a handgun without a permit; fourth degree resisting arrest; second degree conspiracy to distribute cocaine; second degree possession of a weapon by a convicted person; fourth degree aggravated

assault; third and fourth degree unlawful possession of a weapon; third degree terroristic threats; third degree possession of cocaine in a school zone with intent to distribute; and fourth degree obstruction.  On December 14, 1998, the Monmouth County Grand Jury indicted Davenport on the single charge of third degree witness tampering.

These indictments were consolidated for trial, and from February 9 through March 3, 1999, Davenport was tried before a jury and the Honorable Patricia Del Bueno Cleary, J.S.C.  The jury convicted Davenport on the witness tampering indictment, and on Counts 1, 2, 3, 7, 22 and 25 of the September 8, 1997 indictment.  Counts 8, 16 and 17 were dismissed and the jury acquitted Davenport on the remaining counts.

On May 28, 1999, Judge Cleary denied Davenport's motion for a new trial and granted the State's motion for an extended term. Judge Cleary then sentenced Davenport to an aggregate term of life imprisonment with a 30-year period of parole ineligibility.

Davenport filed a direct appeal before the New Jersey Appellate Division, alleging that (1) the trial court violated his constitutional right of self-representation by excluding him from sidebar conferences; (2) the trial court committed plain error by failing to give a cautionary jury charge regarding co-defendant guilty-plea testimony; and (3) the sentences on Counts 3, 7, 22 and 25 were excessive.  On December 20, 2001, the

Appellate Division affirmed the convictions and sentence, but remanded for correction of the judgment of convictions regarding mandatory penalties.  On January 7, 2002, Judge Cleary entered an amended judgment of conviction with the statutory penalties as directed by the Appellate Division.

Davenport petitioned for certification as to all issues raised on appeal before the New Jersey Supreme Court, which in turn granted Davenport's petition to decide whether Davenport's physical exclusion from sidebar conferences violated his constitutional right of self-representation.  State v. Davenport, 174 N.J. 191 (2002).  On July 30, 2003, the New Jersey Supreme Court affirmed the conviction and held as a matter of first impression that Davenport's exclusion from sidebar conferences did not violate his right of self-representation.  State v. Davenport, 177 N.J. 288 (2003).

On November 10, 2003, Davenport timely petitioned for post-conviction relief ("PCR"), and counsel was assigned to represent him in connection with his state PCR proceedings.  The state PCR petition was denied after a hearing on November 3, 2006.  (Pet. at ¶ 11(a)(5).)  On February 9, 2007, Judge Cleary supplemented her November 3, 2006 decision with an amplified record concerning Davenport's claim that she had called him "Mr. Airhead" outside the presence of the jury.  Davenport appealed from the denial of post-conviction relief, and on July 24, 2008, the Appellate

3

Division affirmed the PCR court's decision denying the PCR petition.  (Pet. at ¶ 11(a)(6).)  State v. Davenport, 2008 WL 2828891 (N.J. App. Div. July 24, 2008).  On December 4, 2008, the New Jersey Supreme Court denied certification.  State v. Davenport, 197 N.J. 258 (2008).

Davenport timely filed this habeas petition.  The State has responded and provided the relevant state court record.

**B.  Factual Background**

This Court, affording the appropriate deference to the factual determinations of the state courts, see 28 U.S.C. § 2254(e)(1), will reproduce the recitation as set forth in the New Jersey Supreme Court opinion, issued on July 30, 2003, as to Davenport's direct appeal from his 1999 conviction and sentence:

> The facts are summarized from the trial record.  At the time of his arrest, defendant Johnnie Davenport was a thirty-three year old resident of Neptune Township.  In the weeks prior to his arrest, the Neptune police were engaged in an ongoing investigation into what they believed was an extensive drug-trafficking network with defendant at the helm.  On January 9, 1997, acting on information obtained from several informants as well as evidence from a controlled purchase, the police obtained a search warrant for defendant's home and person.  The following morning, at 5:00 a.m., eighteen Neptune police officers and Monmouth County Prosecutor's Office Narcotics Strike Force members assembled outside defendant's residence, waiting for him to return home.  The police were in full protective gear, anticipating the possibility of gunfire.  Defendant returned between 6:30 and 7:00 a.m.  Shortly thereafter, eight to ten officers approached the house, broke through the door with a battering ram, and announced their presence and that they had a search warrant.  Defendant, who was over six feet tall and weighed approximately three hundred pounds, retreated into his bedroom, slamming the door shut.  As the officers broke through the door, they observed defendant lunge toward a shoebox on the floor.  Before he could reach the box,

4

multiple officers subdued, arrested, and handcuffed him. The shoebox was found to contain two firearms.

An ensuing search revealed large amounts of drugs, money, and firearms in and about the bedroom.  According to Police Sergeant Joseph Burst, defendant, although recalcitrant at first, became cooperative after being subdued and seemed resigned to his fate.  Indeed, defendant told Burst that the stress of running a drug operation was keeping him awake at night and that he was "relieved" and "glad it was over." Shortly after his arrest, defendant signed a <u>Miranda</u> waiver form, and thereafter acknowledged ownership of the drugs, money, and weapons found.  Continuing to cooperate, defendant outlined the history of his drug operations since 1988.  Defendant explained that he began his career dealing cocaine out of a warehouse in Asbury Park, selling up to a kilogram per week.  He moved his operation and began selling drugs out of the apartments of acquaintances, offering a deal whereby defendant would pay the rent and utilities on the apartment if he were permitted to use it to sell drugs. By the time of his arrest, defendant's operation had grown large. He stated that he was purchasing about $22,000 of cocaine per week in New York City, and employing about forty or fifty "street hustlers" who would sell the cocaine and return to him an agreed-upon percentage of earnings.

After giving that detailed oral statement to the police, defendant was transported to the police station, where he gave a corresponding written statement.  He was charged with twenty-five drug- and weapon-related offenses, the most serious of which was first-degree leading a narcotics trafficking network, in contravention of <u>N.J.S.A.</u> 2C:35-3, which carries a sentence of life in prison with a mandatory twenty-five-year minimum period of incarceration without parole.  Defendant also was charged with fourth-degree aggravated assault and third-degree tampering with a witness, stemming from an alleged assault by defendant on one of his drug dealers and a subsequent attempt by defendant to have that dealer file an affidavit to dismiss the assault complaint.

Defendant elected to represent himself.  At a pre-trial hearing conducted on February 3, 1999, the trial court questioned defendant in respect of his desire to proceed <u>pro se</u>.  The court specifically called to defendant's attention that he had the right to an attorney, and that one would be appointed for him if he could not afford one.  Defendant indicated that he understood his right to an attorney but nonetheless desired to proceed <u>pro se</u>.  The court then informed defendant that standby counsel, Paul Escandon (a

pool attorney working for the Office of the Public Defender), had been assigned to assist defendant and the court with the proceedings. ...

. . .

. . . [T]he court established an arrangement whereby defendant's field of movement would be restricted to an area immediately adjacent to his seat at counsel table.  He was not allowed to approach the jury or the witnesses, nor was he permitted to approach the bench for sidebar conferences.  Instead, the judge emphasized to defendant that he could either conduct sidebars via his standby counsel, who would relay messages back and forth between defendant and the court, or defendant could opt to have the jury exit the courtroom whenever he wished to address the court outside the presence of the jury.  The court's principal concern was courtroom security-the trial court repeatedly emphasized that defendant would not be permitted to walk around the courtroom, explaining that the security officers would "jump" on defendant if he "went too far."

Jury selection began a few days later.  Before bringing the potential jurors into the courtroom, the trial court asked for and received defendant's consent for Mr. Escandon to participate during sidebar conferences on "scheduling" issues.  The court then summoned the potential jurors, introduced the lawyers for the State and a codefendant,* and explained that defendant would be representing himself with Mr. Escandon serving as his "legal advisor."  The court explained that during the voir dire process it would be asking the potential jurors various questions, and that if any juror felt uncomfortable responding publicly, he or she should let the court know and the issue could be discussed at sidebar.

Fifty-eight sidebar conferences were conducted with various potential jurors.  Defendant was not physically included in any of them, although Mr. Escandon was present on defendant's behalf.  The record indicates that the sidebars generally consisted of a very short colloquy between the court and the potential juror, without input from either side.  There were three notable exceptions.  In one instance, a juror informed the court that his ex-wife had been charged with and convicted of murder within the past year.  In another, the assistant prosecutor informed the

---

* Defendant's girlfriend was also arrested and tried with defendant.  She was represented by counsel and ultimately pleaded guilty midway through the trial.

court that he was personally acquainted with one of the potential jurors.  Finally, in a third instance, a juror told the court that he was currently taking medication for depression.  All three times, Mr. Escandon stated that he would relay the information disclosed about the juror to defendant and discuss it with him.  The record indicates that defendant did not take any action in any of these instances.  The juror who was on medication remained on the jury, but the other two were excused.

The trial lasted nine days, during which there were twenty-one sidebar conferences, ranging from as many as six sidebars in one day of testimony to as few as one.  Defendant was again not permitted to be physically present at any of them.  The topics addressed at these sidebars ranged from the substantive, such as admissibility of certain evidentiary proffers, to the mundane, such as the scheduling of lunch for the jurors.  Defendant never objected to his exclusion from these conferences.  However, on several occasions Mr. Escandon left the sidebar conference to relay information to or from defendant, or to determine from defendant whether he had an objection to a proposed course of action.  The record also indicates that a number of times when substantive information was being discussed at sidebar, the court excused the jurors and provided defendant with a restatement to ensure his full inclusion.

Apart from his physical exclusion from sidebar discussions, defendant conducted his own defense.  Prior to trial, defendant brought various motions and conducted a <u>Miranda</u> hearing.  At trial, defendant delivered an opening statement to the jury, cross-examined the State's witnesses, called his own witnesses (his mother, a lawyer he had previously consulted, a deputy public defender, a Neptune police officer, and a police detective), and gave a lengthy closing statement in which he argued that his arrest and prosecution were the result of massive police corruption.  Defendant also engaged in numerous exchanges with the court on evidentiary and other issues, both in and out of the presence of the jury, and it is clear that several of the sidebar conferences with Mr. Escandon were conducted at defendant's request.  For example, defendant sought to enter into evidence a letter, part of which indicated that defendant's current address was the county jail.  Mr. Escandon conveyed at sidebar that defendant had requested that the reference to defendant's incarceration be redacted. The court agreed.

Defendant was successful in winning acquittal on ten charges; however, the jury did convict him of numerous drug-

related offenses, including first-degree leading a narcotic trafficking network.  On that, defendant was sentenced to the mandatory extended term of life imprisonment with a thirty-year period of parole ineligibility.  The sentences for defendant's other convictions were all made to run concurrently.[1]

Defendant appealed, and the Appellate Division affirmed in an unpublished decision.[2]  The court noted that it was mindful of the "valid security concerns [that] justif[ied] a limitation of [defendant's] movement around the court room [sic]," especially in the context of a first-degree charge that carried a potential term of life in prison.  The court recognized defendant's right to "control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial."  However, the court found that the right to "roam freely throughout the courtroom is not a necessary concomitant ... of the right to appear pro se."  In the end, the court was satisfied that the jury was at all times aware that defendant was in charge of legal strategy, legal argument, and presentation of evidence, and that nothing done by either the court or standby counsel "could in any way have been interpreted by the jury as a denigration of defendant's right to control and present his own defense."

State v. Davenport, 177 N.J. 288, 293-99 (N.J. 2003).

## II.   STATEMENT OF CLAIMS

Davenport asserts the following claims here:

A.  He was denied his right of self-representation when the

trial judge excluded him from all sidebar conferences at trial.

---

[1]  On May 28, 1999, the trial court denied Davenport's motion for a new trial and granted the State's motion for an extended term.

[2]  Davenport filed a notice of appeal on July 6, 1999, and on December 20, 2001, the Appellate Division affirmed the convictions and sentence, but remanded for correction of his judgment of convictions concerning the mandatory statutory penalties.  On January 7, 2002, Judge Cleary entered an amended judgment of conviction that imposed the correct statutory penalties as directed by the Appellate Division.

B.  Trial court erred in allowing a co-defendant to enter a plea of guilt mid-trial and testify against him, and the trial court erred in failing to give curative instructions to the jury cautioning the jury about co-defendant guilty-plea testimony against him.

C.  Appellate counsel was ineffective for failing to raise key issues on direct appeal.

D.  He was denied his right of self-representation when the trial court improperly denied him from arguing a pretrial motion for grand jury voting and attendance records.

E.  He was denied the right to disclosure of the confidential informant who was used to procure a search warrant, as the informant was not proven or established as reliable in the past.

F.  He was denied effective assistance of trial counsel when seven months before trial the trial court denied his request for an investigator, and then denied his request to have standby counsel undertake his defense at trial when the request for an investigator was denied.

G.  The trial court verbally attacked him, calling him an "air head" in a pretrial hearing to sanitize a letter.

The State essentially contends that the petition should be denied for lack of substantive merit or because it fails to raise claims of federal constitutional dimension.  The State also contends that the petition should be dismissed because Davenport

9

failed to exhaust all of his claims in state court and has procedurally defaulted on several of his claims.

This Court finds that the petition was timely filed pursuant to 28 U.S.C. § 2244(d)(1) and (2).  Also, as to the State's claim that Davenport has failed to exhaust all of his claims for habeas relief, the Court notes that, under 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  Because this Court has determined, as set forth below, that this petition should be denied for lack of merit, the petition need not be dismissed for failure to exhaust state court remedies on all claims asserted.

### III.   STANDARD OF REVIEW

A pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972). A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Att'y Gen., 878 F.2d 714, 721-22 (3d Cir. 1989).  Thus, the Court will accord Davenport's habeas petition that liberal construction.

This Court has jurisdiction to entertain a habeas petition challenging a state conviction or sentence only where the inmate's custody violates federal law.  28 U.S.C. § 2254(a).  "In

conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." Smith v. Phillips, 455 U.S. 209, 221 (1982). Generally, "[i]f a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable," Engle v. Isaac, 456 U.S. 107, 120 n.19 (1982), and "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76 (2005).

In reviewing a § 2254 petition, a federal court may not address a federal constitutional claim pertinent to the facts of the case unless the petitioner asserts the claim as a ground for relief. That is, "errors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause." Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997). In addition, "it is well established that a state court's misapplication of its own law does not generally raise a constitutional claim." Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997) (citations and internal quotes omitted).

A federal court also may only grant habeas relief when a state court has adjudicated a petitioner's federal claim on the

11

merits.  See 28 U.S.C. § 2254(d).  Where a federal claim was "adjudicated on the merits" in state court proceedings, the writ must be denied unless adjudication of the claim either involved an unreasonable application of clearly established federal law, or was based on unreasonable determination of the facts in light of the evidence before the state court.  See 28 U.S.C. § 2254(d).

The unreasonableness standards of § 2254(d) govern only claims that were "adjudicated on the merits in State Court proceedings."  28 U.S.C. § 2254(d).  "An 'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground."  Rompilla v. Horn, 355 F.3d 233, 247 (3d Cir. 2004) (citations and internal quotes omitted), reversed on other grounds sub nom., Rompilla v. Beard, 545 U.S. 374 (2005); see Rolan v. Vaughn, 445 F.3d 671, 678 (3d Cir. 2006).  A state court may render an adjudication on the merits of a federal claim by rejecting the claim without any discussion whatsoever.  See Rompilla, 355 F.3d at 247; see also Chadwick v. Janecka, 312 F.3d 597, 605-06 (3d Cir. 2002) (even summary adjudication by state court on merits of claim is entitled to § 2254(d) deference).  On the other hand, "[i]f the petitioner's legal claims were presented but not addressed by the state courts, 28 U.S.C. § 2254(d) does not apply."  Rolan, 445 F.3d at 678; see Hameen v. State of

12

Delaware, 212 F.3d 226, 248 (3d Cir. 2000) (as to claims presented to but not adjudicated by state court, federal court may exercise independent judgment).

If the New Jersey courts adjudicated Davenport's claims on the merits, this Court may not grant relief unless either § 2254(d)(1) or § 2254(d)(2) is satisfied.  See 28 U.S.C. § 2254(d).  Accordingly, this Court may not grant habeas relief to Davenport unless the adjudication of a federal claim by the New Jersey courts involved an unreasonable application of clearly established United States Supreme Court law, see 28 U.S.C. § 2254(d)(1), or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding and Davenport is in custody in violation of the Constitution or laws or treaties of the United States.  See 28 U.S.C. § 2254(a), (d)(2).

When the grounds raised in the petition are governed by 28 U.S.C. § 2254(d)(1), a court must begin the analysis by determining the relevant clearly-established law.  See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004).  Clearly-established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision."  Williams v. Taylor, 529 U.S. 362, 412 (2000).  A court must look for "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  Lockyer v. Andrade, 538 U.S. 63, 71, 72 (2003).

13

A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1) if the state court "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." Williams, 529 U.S. at 405-06. Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Whether a state court's application of federal law is "unreasonable" must be judged objectively; an application may be incorrect, but still not unreasonable. See id. at 409-10. "The unreasonable application test is an objective one-a federal court may not grant habeas relief merely because it concludes that the state court applied federal law erroneously or incorrectly." Thomas v. Varner, 428 F.3d 491, 497 (3d Cir. 2005) (quoting Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005)).[3]

---

[3]   See also Marshall v. Hendricks, 307 F.3d 36, 71 n.24 (3d Cir. 2002) ("[D]ecisions of federal courts below the level of the United States Supreme Court may be helpful to [a court] in ascertaining the reasonableness of state courts' application of clearly established United States Supreme Court precedent, as well as helpful amplifications of that precedent.") (citations and internal quotes omitted).

Federal courts must apply a "presumption of correctness to factual determinations made by the state court."  Id.; see 28 U.S.C. § 2254(e)(1).  This presumption of correctness based upon state court factual findings can only be overcome by clear and convincing evidence.  See Duncan v. Morton, 256 F.3d 189, 196 (3d Cir. 2001) (citing 28 U.S.C. § 2254(e)(1)).  Consequently, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings." Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001).

## IV.   ANALYSIS

### A.   Sixth Amendment (Denial of Self-Representation)

Davenport argues that he was denied the right of self-representation when the trial judge excluded him from sidebar conferences at trial.  Davenport raised this claim on direct appeal, and the Appellate Division found that "nothing that was done, either by the trial court or standby counsel, could in any way have been interpreted by the jury as a denigration of defendant's right to control and present his own defense."  (12-20-01 App. Div. Op. at pp. 6-7.)  The New Jersey Supreme Court granted certification on the issue, and held that exclusion of Davenport as a pro se defendant from sidebar discussions did not violate his Sixth Amendment right of self-representation.  State v. Davenport, 177 N.J. 288 (2003).

The New Jersey Supreme Court noted that Davenport was excluded from all 58 sidebar conferences during jury voir dire,

although his standby counsel was present on his behalf.  The sidebar conferences generally consisted of "a very short colloquy between the court and the potential jury, without input from either side."  There were three exceptions: (1) a juror informed the court that his ex-wife had been charged and convicted of murder within the past year; (2) the assistant prosecutor informed the court that he was acquainted with a potential juror; and (3) a juror told the court that he was on medication for depression.  In each of these instances, standby counsel stated that he would relay the information to Davenport and discuss it with him.  Davenport took no action on any of these instances.  The juror who was on medication remained on the jury, but the other two jurors were excused.  State v. Davenport, 177 N.J. at 297-98.

The trial lasted nine days, and Davenport was excluded from all 21 sidebar conferences therein.  The New Jersey Supreme Court observed that:

> The topics addressed at these sidebars ranged from the substantive, such as admissibility of certain evidentiary proffers, to the mundane, such as the scheduling of lunch for the jurors.  Defendant never objected to his exclusion from these conferences.  However, on several occasions Mr. Escandon left the sidebar conference to relay information to or from defendant, or to determine from defendant whether he had an objection to a proposed course of action.  The record also indicates that a number of times when substantive information was being discussed at sidebar, the court excused the jurors and provided defendant with a restatement to ensure his full inclusion.
>
> Apart from his physical exclusion from sidebar discussions, defendant conducted his own defense.  Prior to trial, defendant brought various motions and conducted a Miranda hearing.  At trial, defendant delivered an opening statement

to the jury, cross-examined the State's witnesses, called
his own witnesses (his mother, a lawyer he had previously
consulted, a deputy public defender, a Neptune police
officer, and a police detective), and gave a lengthy closing
statement in which he argued that his arrest and prosecution
were the result of massive police corruption.  Defendant
also engaged in numerous exchanges with the court on
evidentiary and other issues, both in and out of the
presence of the jury, and it is clear that several of the
sidebar conferences with Mr. Escandon were conducted at
defendant's request.  For example, defendant sought to enter
into evidence a letter, part of which indicated that
defendant's current address was the county jail.  Mr.
Escandon conveyed at sidebar that defendant had requested
that the reference to defendant's incarceration be redacted.
The [trial] court agreed.

State v. Davenport, 177 N.J. at 298.

The New Jersey Supreme Court analyzed Davenport's claim

under Faretta v. California, 422 U.S. 806, 816 (1975) (finding

defendant's right of self-representation as necessarily implied

by structure of Sixth Amendment), and McKaskle v. Wiggins, 465

U.S. 168 (1984) (concerning role of standby counsel).  The court

emphasized that "[t]o determine whether a defendant's Faretta

right has been respected, 'the primary focus must be on whether

the defendant had a fair chance to present his case in his own

way ... .  The specific rights to make his voice heard ... form

the core of a defendant's right of self-representation.'"

Davenport, 177 N.J. at 301 (quoting McKaskle, 465 U.S. at 177).

The New Jersey Supreme Court decided the case as follows:

Defendant contends that his exclusion from the sidebar
conferences violated his Faretta right.  In order to
establish the asserted violation, defendant must show that
the participation of standby counsel either (1) deprived him
of actual control over the case that he presented to the

17

jury, or (2) destroyed the perception of the jury that defendant was representing himself and in control of the case.  See McKaskle, supra, 465 U.S. at 178-79, ...; [State v.] Gallagher, supra, 274 N.J. Super. [285,] 297 [App. Div. 1994].

A.

In respect of the first prong, the record in this matter fairly shouts that it was defendant, and defendant only, who controlled the content and presentation of his defense. Defendant raised and argued pretrial motions, and conducted his own opening, cross-examinations, direct examinations, and closing.  In short, defendant exercised control over every substantive phase of his defense.  His only argument is that his physical exclusion from the sidebar conferences effected a loss of control over his defense.

Of the fifty-eight sidebars that took place during voir dire, the overwhelming majority of them consisted of short colloquies between the judge and a potential juror over whether the potential juror could sacrifice about a month off from work without undue hardship.  The record reflects that generally neither the prosecuting attorney, nor defendant's standby counsel, nor counsel for the codefendant provided any input to the brief conversations that occurred between the court and the potential juror.  As noted above, on the rare occasions that something more substantive than time considerations and trial scheduling was discussed, the record indicates that Mr. Escandon relayed the information to defendant, who opted to take no action.  Although we find much to commend in the dissent's suggestion that a "struck jury" could have been employed, we are unpersuaded from this record that the failure to do so worked any deprivation to defendant concerning his control of a defense of his choosing.

The sidebars during trial present a closer call.  Again, as noted, most were mundane in nature and dealt with matters such as scheduling of witnesses or jury breaks.  However, defendant points to three sidebars in particular, the exclusion from which he alleges violated his Faretta right.

Defendant points to one sidebar in which standby counsel, the prosecuting attorney, and the court had a discussion about whether and how defendant would testify without an attorney.  This argument may have had some merit, if not for the fact that immediately after the sidebar, the court dismissed the jury and proceeded to address with defendant the entire contents of the sidebar discussion that raised the issue.  The court then had a lengthy discussion with defendant on the record regarding whether he planned to

testify.  In addition, on numerous other occasions in open
court the judge discussed with defendant the procedure under
which he would testify without an attorney, although we note
that defendant ultimately elected not to testify.  Under
those circumstances, we find no merit to the contention that
defendant was undermined in his ability to control the
content and presentation of his own defense.

Two sidebars touched on evidentiary issues, and during each
the court asked standby counsel if he knew defendant's
purpose in pursuing a certain line of questioning.
Defendant asserts that those sidebars resulted in standby
counsel conjecturing and overstepping his bounds by
inappropriately speaking for defendant.  However,
defendant's absolutist position ignores the flexibility
found to be essential in situations involving a pro se
defendant and standby counsel.  As noted in McKaskle, supra,
the "categorical [ ] silencing [of] standby counsel" is not
necessary to preserve a defendant's Faretta right, and there
is no "absolute bar on standby counsel's unsolicited
participation."  465 U.S. at 176-77, ....

In light of the valid security concerns attendant to the
trial of an alleged drug kingpin facing a life sentence, we
believe that this is one of those situations in which the
participation by standby counsel was appropriate, and would
have been appropriate even had defendant objected.* However,
in that respect, we note that defendant never once objected
to the participation of standby counsel at sidebars.  When
the trial court asked defendant if he understood that he
would not be allowed at sidebar, he replied "yes."  In
Faretta, supra, representation by unwanted counsel was
deemed constitutionally impermissible "unless the accused
has acquiesced in such representation." 422 U.S. at 821 ....
The Court clarified the issue of acquiescence in McKaskle,
when it stated that "a pro se defendant's solicitation of or
acquiescence in certain types of participation by counsel
substantially undermines later protestations that counsel
interfered unacceptably."  465 U.S. at 182 ...; see also
Myers v. Johnson, 76 F.3d 1330, 1334 (5th Cir. 1996)(stating
that "[o]nce a pro se defendant invites or acquiesces in

---

* In this regard, we acknowledge that the trial court's
security concerns could have been better articulated on the
record.  We are mindful, however, that, in addition to the
serious charges defendant was facing, the trial court was
fully aware of the violent circumstances surrounding
defendant's arrest, as well as the pending assault charges.

substantial participation by standby counsel, even if he
insists that he is not waiving his <u>Faretta</u> rights, he
abandons his right to later complain that counsel interfered
with his presentation of his defense"). Although we need
not decide whether defendant's actions constituted a waiver
of his <u>Faretta</u> right, we note that his lack of objections
and acquiescence in the courtroom protocol established by
the trial court erode his current assertion that standby
counsel overstepped his bounds.

B.

The second prong of the <u>McKaskle</u> test for preservation of
the <u>Faretta</u> right addresses whether the participation of
sidebar counsel "destroy[ed] the jury's perception that the
defendant [was] representing himself." 465 U.S. at 178 ....
Just as we are persuaded that defendant controlled the
content and presentation of his defense, we are convinced
also that the jury was fully aware of that reality.

Before even selecting a jury, the trial court informed the
potential jurors that "Mr. Davenport is representing
himself. He appears pro se, but we have Mr. Paul Escandon
who is going to act as legal advisor to Mr. Davenport."
When trial began, as noted, defendant delivered the opening
statement, cross-examined the State's witnesses, called and
examined his own witnesses, and delivered a lengthy closing
statement. In addition, although defendant was not
physically present at sidebars, the jury on numerous
occasions witnessed Mr. Escandon relay information back and
forth between defendant and the court at sidebar
conferences. This is wholly consonant with a perception of
defendant representing himself, with Mr. Escandon as his
legal advisor. Finally, while charging the jury, the court
again reminded them that Mr. Davenport had represented
himself, stating that "Mr. Escandon has been appointed by me
to be present and to assist Mr. Davenport, if Mr. Davenport
wishes, concerning legal procedures in this case. He hasn't
addressed you. He will not address you. And he is not the
attorney for Mr. Davenport. So please keep that in mind."

Thus, the trial judge informed and repeatedly reminded the
jury that defendant was representing himself. And,
defendant conducted his entire defense, apart from being
physically present at sidebar. In these circumstances, we
are not convinced that a reasonable jury would form any
belief other than that defendant was representing himself.
<u>See</u> <u>id.</u> at 183 ... (explaining that, when standby counsel
"introduc[es] evidence or object[s] to testimony, ... [the]
likelihood that the defendant's appearance in the status of

20

one defending himself will be eroded is ... slight, and in any event it is tolerable"). Defendant's <u>Faretta</u> right, therefore, was not violated.

We note the dissent's emphasis that a harmless error analysis is not appropriate when the right of self-representation is concerned. <u>Post</u> at 1077. The point is inapposite, however, in light of our finding that whatever erosions were occasioned on defendant's <u>Faretta</u> right were tolerable, and did not rise to the level of a violation of the right. We need not consider the effect of finding a <u>Faretta</u> violation on defendant's conviction, because we find no such violation.

IV.

Although we have not before addressed the issue of a defendant's right to attend sidebar conferences, the issue has been addressed in several out-of-jurisdiction cases. In <u>United States v. Mills</u>, 895 F.2d 897 (2d Cir.), <u>cert. denied</u>, 495 U.S. 951, ..., the Second Circuit addressed the question in circumstances substantially identical to those presented here. The court explained that the defendant "conduct[ed] every aspect of his defense .... [He] made the opening statement; he cross-examined the government's witnesses; he examined his own witnesses[;] ... [he] himself made most of whatever defense objections were made to the government's questions; and [he] made his own closing argument." <u>Id.</u> at 905. Thus, the issue there was the same as here: whether the exclusion from sidebars deprived the defendant of his <u>Faretta</u> right. The Second Circuit ultimately concluded that the <u>Faretta</u> right was not violated, "finding no indication that [the defendant] did not control and guide his defense and only a minuscule risk that the jury did not perceive [the defendants] control." <u>Ibid.</u> Notably, in <u>Mills</u> the defendants standby counsel made legal arguments before the trial court on a variety of motions, unlike here where defendant argued all of his own motions. <u>See id.</u> at 904.

Other courts have reached the opposite conclusion. <u>See, e.g.</u>, <u>People v. Rosen</u>, 81 N.Y.2d 237, 597 N.Y.S.2d 914, 613 N.E.2d 946, 949-50 (1993); <u>Snowden v. State</u>, 672 A.2d 1017, 1022 (Del. 1996); <u>United States v. McDermott</u>, 64 F.3d 1448, 1454 (10th Cir. 1995), <u>cert. denied</u>, 516 U.S. 1121 ... (1996); <u>see also</u> <u>Oses v. Massachusetts</u>, 961 F.2d 985 (1st Cir.), <u>cert. denied</u>, 506 U.S. 954 ...(1992)(reversing conviction where defendant was excluded from sidebars, but also noting that defendant was forced to appear bound and gagged before jury and that court made improper disparaging remarks about defendant). The decision in <u>McDermott</u>, <u>supra</u>, reversed a conviction based on facts (exclusion from approximately

21

thirty trial sidebars) that were similar to those here.  64
F.3d at 1454.  Although it reversed, the Tenth Circuit noted
that under McKaskle, some unsolicited participation will
merely "erode" the Faretta right.  Ibid. The court explained
that "erode" is not synonymous with "violate," and that
therefore some "minor incursions" will fall short of a
Faretta violation.  Ibid.  Thus, a "fact-specific" inquiry
is necessary to distinguish the minor incursions of Mills-
type cases from the more significant violation presented in
McDermott.  Ibid.

Applying a fact-sensitive analysis in this appeal, we are
persuaded that this case falls closer to Mills than
McDermott on the Faretta continuum.  Although reasonable
minds can differ, we are convinced based on the record that
defendant remained in full control of the content and
presentation of his case throughout the trial, and that the
jury perceived that reality.  Whatever incursions the
participation of standby counsel occasioned upon defendant's
Faretta right were minor erosions, and did not rise to the
level of a denial of the right of self-representation.

                              V.

We cannot conclude without noting our concern that the
exclusion of defendant from sidebars may have created the
perception in the mind of the jury that defendant was
dangerous, or not to be trusted.  See State v. Maisonet, 166
N.J. 9, 17, 763 A.2d 1254 (2001)(stating that "trial courts
have a duty to scrutinize closely those practices that pose
a threat to fairness and do not serve an essential state
purpose")(citation omitted).  Nonetheless, that is a
regrettable consequence of the obligation of the trial
court, regardless of whether a defendant is pro se or not,
to fashion "proper security measures within the courtroom
and ... [to take action] to protect the jury, [defendants,]
counsel, witnesses, and members of the public."  State v.
Zhu, 165 N.J. 544, 557, 761 A.2d 523 (2000)(citation
omitted).  In short, a defendant's exercise of his right to
represent himself is just that; serving as his own lawyer
does not unfetter him from restrictions placed upon his
movements by necessary and reasonable security measures.
See Martinez, supra, 528 U.S. at 162 ... (stating that "the
government's interest in ensuring the integrity and
efficiency of the trial at times outweighs the defendant's
interest in acting as his own lawyer").

Although we find no constitutional violation in the manner in
which this trial was conducted, we acknowledge the handling
of the sidebars is a nettlesome problem that will require

                              22

some creativity by the trial bench.  See Martinez, supra, 528 U.S. at 164 ...(Breyer, J., concurring)(stating that "judges closer to the firing line have sometimes expressed dismay about the practical consequences of [the holding in Faretta]").  We hold today that a defendant's physical presence at sidebar conferences is not an absolute requirement in order to comport with the Faretta self-representation right, so long as the exclusion does not deprive the defendant of meaningful participation in the content of the sidebars through his standby counsel representative.  Nonetheless, trial courts that confront this issue in the future should explore every avenue to ensure that defendants can participate in sidebars to the fullest extent possible without compromising courtroom security.  This may be accomplished, in appropriate circumstances, through defendant's physical presence at sidebar when safety is not a concern, through minimal use of standby counsel as a conduit, by sending the jury to the jury room and having the discussion in open court (as was done on several occasions here), or even through advances in courtroom technology.  See, e.g., State v. Cook, 330 N.J. Super. 395, 415, 750 A.2d 91 (App.Div.), certif. denied, 165 N.J. 486, 758 A.2d 646 (2000)(explaining that defendant who was not permitted to be physically present at sidebars "was given use of a wireless listening device whereby he could sit at counsel table" and listen to what was being discussed at sidebar).  In circumstances in which trial courts determine that defendants should not be allowed at sidebar, we expect that the legitimate security concerns that necessitate such a finding will be detailed clearly on the record.

Davenport, 177 N.J. at 302-10.

The Sixth Amendment gives a criminal defendant the right to represent himself at trial, Faretta, 422 U.S. at 834, but only to the extent that he is "able and willing to abide by rules of procedure and courtroom protocol".  McKaskle, 465 U.S. at 173; see Martinez v. Ct. of App. of Cal., 528 U.S. 152, 162 (2000) (holding right to self-representation must, at times, yield to government's interest in ensuring trial integrity and efficiency); United States v. Schwartz, 315 Fed.Appx. 412, 416 (3d Cir. 2009).

This Court finds here that Davenport has not demonstrated that the New Jersey Supreme Court decision, in State v. Davenport, 177 N.J. 288 (2003), as to his exclusion from sidebar conferences claim, was "contrary to clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  While the Supreme Court has not addressed this issue, the Third Circuit Court of Appeals has held that exclusion from a sidebar conference "does not automatically constitute a Sixth Amendment violation."  Schwartz, 315 Fed.Appx. at 416, n.1 (3d Cir. 2009) (citing United States v. Mills, 895 F.2d 897, 904-05 (2d Cir. 1990)).  Instead, "the exclusion must be viewed 'in the context of the trial as a whole.'"  Id.  Here, Davenport was actively involved in the trial.  As observed by the New Jersey Supreme Court, "the record in this matter fairly shouts that it was defendant, and defendant only, who controlled the content and presentation of his defense. ... In short, [Davenport] exercised control over every substantive phase of his defense."  State v. Davenport, 177 N.J. at 303.  He raised and argued pretrial motions, conducted his own opening, cross-examined the State's witnesses, called and examined his own witnesses, and "delivered a lengthy closing statement."  Id. at 303, 306.  The New Jersey Supreme Court also noted that, even though Davenport was not physically present at the sidebars, standby counsel relayed information back and forth between Davenport and the trial judge,

so the jury certainly had the perception that Davenport was representing himself.  Moreover, the trial judge reminded the jury during the jury charge that Davenport had represented himself.  <u>Id.</u> at 306.

The trial court set the parameters of Davenport's field of movement before trial: he was restricted to an area immediately adjacent to his seat at counsel table, was not allowed to approach witnesses, could approach but not touch the jury rail, and could not approach the bench for sidebar conferences.  The judge offered that Davenport could conduct sidebars via his standby counsel who would relay messages back and forth between Davenport and the court, or Davenport could opt to have the jury exit from the courtroom whenever he wished to address the court outside the presence of the jury.  The court emphasized to Davenport that the principal concern was courtroom security, and that Davenport would not be permitted to walk around the courtroom except within the parameters set by the court.  <u>Id.</u> at 296-97.

A criminal defendant's right to represent himself extends only insofar as he is "able and willing to abide by rules of procedure and courtroom protocol."  <u>Schwartz</u>, 315 Fed.Appx. at 416 (citing <u>Faretta</u>, 422 U.S. at 834); <u>see</u> <u>Martinez</u>, 528 U.S. at 162 (explaining "standby counsel may participate in the trial proceedings, even without the express consent of the defendant, as long as that participation does not 'seriously undermine' the

25

'appearance before the jury' that the defendant is representing
himself"). At trial, Davenport's standby counsel attended
sidebar conferences on his behalf, and ably represented
Davenport's interests, but did not detract from the impression
that Davenport was acting on his own behalf. Moreover, this
Court observes that, had Davenport been permitted to attend
sidebar conferences, it would have likely prejudiced him because,
when accompanied by court security officers, the jury would have
realized Davenport was in custody, a fact which Davenport
apparently endeavored to conceal throughout trial. See United
States v. Green, 2011 WL 1877299, *9 (E.D. Pa. May 16, 2011).

Upon careful review of the record, this Court finds nothing
substantive to support Davenport's Faretta claim asserting denial
of his right to self-representation based on his exclusion from
sidebar conferences during his trial proceedings. Indeed, this
Court concludes that the determination of the New Jersey Supreme
Court, as recited above, was a comprehensive and reasonable
application of clearly-established federal law, and was based on
a reasonable determination of the facts in light of the evidence
presented in the state court proceeding. Davenport has failed to
demonstrate that the New Jersey Supreme Court opinion, when
evaluated objectively and on the merits, resulted in an outcome
that cannot be reasonably justified. Therefore, the Court will
deny federal habeas relief on this claim because it is
substantively without merit.

**B.   Co-Defendant Guilty-Plea Testimony Against Davenport**

Davenport next argues that the trial court erred in allowing a co-defendant to enter a plea of guilt mid-trial.  Further, Davenport contends that the trial court failed to give a properly curative instruction cautioning the jury about co-defendant guilty-plea testimony against Davenport.  Davenport raised this claim on direct appeal.

The Appellate Division held:

Other individuals were charged with participating in defendant's criminal enterprise.  During the course of his trial, three of those individuals entered guilty pleas and testified against defendant.  Defendant now maintains the trial court erred when it did not give the jury a cautionary instruction regarding the testimony of these three witnesses.

When a co-defendant changes his plea during trial, the proper procedure for the trial court is to give cautionary instructions to the jury on the impact of that plea as it affects the remaining defendants.  State v. Gardner, 54 N.J. 37, 46 (1969).  When faced with guilty plea testimony by a co-defendant, a court is "obligated independently ... to give the jury a proper cautionary instruction as to the limited use of this testimony for credibility purposes, even in the absence of ... a request therefor by defendants." State v. Stefanelli, 78 N.J. 418, 434 (1979).  "'[T]he status of a witness as an accomplice or co-defendant invites special consideration' with respect to that witness's credibility." State v. Harris, 156 N.J. 122, 179 (1998)(quoting State v. Gross, 121 N.J. 1, 16 (1990)).

In the present case, Angela Gamble, Venika Davis, and Andrea Wheeler were all indicted with defendant.  The severance motion of Ms. Gamble and Ms. Davis was granted prior to the commencement of this trial; defendant and Ms. Wheeler were tried together.  While the trial was in progress, all three entered guilty pleas and testified on behalf of the State against the defendant.  The trial court, however, gave no cautionary instruction to the jury, either at the time of their testimony, or in its final charge.

Although such a charge should have been given, we are
satisfied its omission did not constitute reversible error.
The trial court gave a comprehensive charge to the jury on
assessing the credibility of the various witnesses.  The
details of the respective pleas were fully spread before the
jury as each of the three testified.  Defendant, in his
cross-examination, challenged their motivations for entering
their respective plea bargains.  We are confident, having
scrutinized this record, that the jury was fully aware that
the testimony of these three witnesses should be reviewed
and analyzed with care in light of the favorable dispositions
each had received.  State v. Harris, supra, 156 N.J. at 180
(failure to give such a charge not reversible error in a
capital murder trial); State v. Stefanelli, supra, 78 N.J.
at 436 (failure to give such a charge harmless error).

Defendant's assertion to the contrary notwithstanding, the
State presented more than ample evidence to convict
defendant without the testimony of these three witnesses.
We have no basis to conclude that the failure to provide
such an instruction was clearly capable of producing an
unjust result.  R. 2:10-2.

(12-20-01 App. Div. Op. at pp. 8-9.)

As a general rule, evidentiary errors of state courts are
not considered to be of constitutional dimension, cognizable in a
federal habeas corpus proceeding, unless the error has deprived
the defendant of fundamental fairness in his criminal trial.
Donnelly v. DeChristoforo, 416 U.S. 637, 642-43 (1974).  Here,
Davenport contends that the use of co-defendant guilty-plea
testimony at his trial constitutes a deprivation of due process.

"[T]he use of a co-conspirator's guilty plea as substantive
proof of a defendant's complicity in a conspiracy without
cautionary instruction is not admissible as evidence." Bisaccia
v. Att'y Gen. of State of N.J., 623 F.2d 307, 312 (3d Cir. 1980).
In Bisaccia, the prosecution presented the testimony of a co-

conspirator at trial, who testified about his plea of guilt to a charge arising from the alleged conspiracy for which Bisaccia also was charged.  Over defense counsel's objection, the trial court allowed testimony concerning the co-conspirator's guilty plea to be introduced at trial without requiring the prosecutor to explain its purpose and without cautioning the jury that evidence of this nature could not be used as substantive proof of a conspiracy.  Moreover, in the prosecution's summation, the prosecutor stressed the significance of the co-conspirator's guilty plea.  Bisaccia, 623 F.2d at 308-09.[4]

On direct appeal, New Jersey Appellate Division agreed with Bisaccia, finding that the testimony as to the guilty plea was used for the purpose of impressing the jurors of the existence of the conspiracy.  The Appellate Division concluded that the prejudicial error inherent in the admission of such testimony deprived the defendant of a very substantial protection to which he was entitled.  Id. at 309.  The New Jersey Supreme Court, however, found no violation of constitutional dimension.  Specifically, the New Jersey Supreme Court addressed Bisaccia's

---

[4]  In summation, the prosecutor stated: "[A] young man named Joseph Cicala pleaded guilty to conspiring to break, enter and commit larceny inside the Bruno home.  They (the defendants) said it never happened, you see.  Mr. Cicala pleaded guilty to something that didn't happen.  Ladies and gentlemen, isn't your intelligence being insulted by an argument like that?  I mean, aren't these defendants talking down to you as if you were a bunch of five year old children?"  Id. at 308-09.

argument in terms of the Sixth Amendment's Confrontation Clause and found that because cross-examination of the co-conspirator was available, no constitutional violation occurred.  Further, while the trial court erred in failing to give a cautionary instruction to the jury concerning the use of testimony, the New Jersey Supreme Court found that the error was harmless.  Id.

Bisaccia then petitioned for federal habeas relief, which was denied.  On appeal from that denial, the Third Circuit Court of Appeals reversed and remanded, holding that the use of a co-conspirator's guilty plea as substantive proof of Bisaccia's complicity in a conspiracy without a cautionary instruction was "sufficiently unfair to raise the spectre of unconstitutionality for purposes of habeas corpus relief."  Id. at 312.  That court relied substantially on United States v. Toner, 173 F.2d 140 (3d Cir. 1949) in reaching its conclusion, as follows:

> From the common sense point of view a plea of guilty by an alleged fellow conspirator is highly relevant upon the question of the guilt of another alleged conspirator. If A's admission that he conspired with B is believed, it is pretty hard to avoid the conclusion that B must have conspired with A.  This is one of the cases, therefore, where evidence logically probative is to be excluded because of some countervailing policy.  There are many such instances in the law.  See 4 Wigmore Evidence § 1171 et seq. (3d Ed. 1940).
>
> The foundation of the countervailing policy is the right of every defendant to stand or fall with the proof of the charge made against him, not against somebody else. Acquittal of an alleged fellow conspirator is not evidence for a man being tried for conspiracy.  So, likewise, conviction of an alleged fellow conspirator after a trial is not admissible as against one now being charged.  The defendant had a right to have his guilt or innocence determined by the evidence presented against him, not by

what has happened with regard to a criminal prosecution against someone else.  We think that the charge given upon this point was contrary to that rule and inadvertently, of course, deprived the defendant of a very substantial protection to which he was entitled.

173 F.2d at 142.  (footnotes omitted).  Judge Goodrich's rationale in <u>Toner</u> is bottomed as much on concepts of constitutional fairness as on concepts of "evidentiary" fairness.  For the underlying purpose ultimately is to assure a criminal defendant that his guilt or innocence will be "determined by the evidence presented against him, not by what has happened with regard to a criminal prosecution against someone else." <u>Id.</u>  The inherent unfairness and likely prejudice of such evidence in this case challenges our concept of due process.  The Seventh Circuit, in addressing the practice of introducing evidence of other, related crimes, has noted:

> When it must be said that the probative value of such evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission, then use of such evidence by a state may rise to the posture of fundamental fairness and due process of law.

<u>United States ex rel. Bibbs v. Twomey</u>, 506 F.2d 1220, 1223 (7th Cir. 1974), quoting <u>United States ex rel. Durso v. Pate</u>, 426 F.2d 1083, 1086 (7th Cir. 1970).  Under the circumstances here, the admission of the co-defendant's guilty plea, the failure of the trial judge to give cautionary instructions to the jury about this evidence and the prosecutor's comments on this evidence so exceeded the tolerable level of ordinary trial error as to amount to a denial of constitutional due process.  As such, we hold that the appellant has satisfied the requirement of 28 U.S.C. § 2254(a).

<u>Bisaccia</u>, 623 F.2d at 312-13.

Davenport asks this Court to find that the absence of a cautionary instruction to the jury concerning the use of co-defendant guilty-plea testimony as substantive proof of the conspiracy charges was an error of constitutional proportion.  Generally, a jury instruction (or lack of one as asserted here) that is inconsistent with state law does not merit federal habeas

relief.  Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding:

> the only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record.  In addition, in reviewing an ambiguous instruction ..., we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution. And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly."  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."

McGuire, 502 U.S. at 72-73 (citations omitted); see Smith v. Spisak, 130 S.Ct. 676, 684 (2010) (no right to habeas relief if Supreme Court has not previously held jury instruction unconstitutional for same reason); Waddington v. Sauausad, 555 U.S. 179 (2009).  Thus, the Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law."  Horn, 120 F.3d at 416; see In re Winship, 397 U.S. 358, 364 (1970) ("Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); Sandstrom v. Montana, 442 U.S. 510, 523 (1979) (jury instructions that suggest jury may convict without proving each element of crime beyond reasonable doubt violate constitutional rights of the accused).

A habeas petitioner who challenges state jury instructions must "point to a federal requirement that jury instructions ... must include particular provisions," or demonstrate that the jury "instructions deprived him of a defense which federal law provided to him." Rosemeyer, 117 F.3d at 110.  This is because district courts do not "sit as super state supreme courts for the purpose of determining whether jury instructions were correct under state law with respect to the elements of an offense and defenses to it." Id.  Thus:

> In considering whether this case involves a claim of error under the Constitution, laws, or treaties of the United States, it is critical to remember that the Supreme Court has made it clear that the states define the elements of state offenses.  Accordingly, while there may be constitutionally required minimum criteria which must be met for conduct to constitute a state criminal offense, in general there is no constitutional reason why a state offense must include particular elements. See McMillan v. Pennsylvania, 477 U.S. 79, 84-86 . . . (1986).

> It thus follows that for the error of state law in the justification instructions, assuming that there was an error, to be meaningful in this federal habeas corpus action, there would have to be a body of federal law justifying the use of deadly force which is applicable in a state criminal action charging an offense based on the defendant's use of that force.  Then the error in the jury instructions would be significant if the instructions did not satisfy that body of law.  Put in a different way, the jury instructions on justification, even if correct under state law, would need to have relieved the state of the necessity of proving an element of the offense as required by federal law or to have deprived the petitioner of a defense the state had to afford him under federal law in order to be significant in a federal habeas corpus action. If we concluded that a petitioner could obtain habeas corpus relief without making such a showing, then district courts in habeas corpus cases would sit as super state supreme courts for the purpose of determining whether jury

instructions were correct under state law with respect to the elements of an offense and defenses to it.

Rosemeyer, 117 F.3d at 110.

"An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

This Court finds that the lack of cautionary instructions to the jury regarding co-defendant guilty-plea testimony did not produce an unjust result. In reviewing the trial record, the Appellate Division held that the trial judge gave a comprehensive charge to the jury on assessing the credibility of the various witnesses, and that Davenport effectively examined the motivation for entering a plea of guilt during vigorous cross-examination. Consequently, the Appellate Division ruled that the jury was fully aware that the testimony at issue should be reviewed and analyzed with care, and that the failure to give a cautionary instruction was simply harmless error. (12-20-01 App. Div. Op. at pp. 8-9.)

This Court also has examined the trial record and finds no error of constitutional dimension in failing to give a cautionary jury charge on the use of co-defendant guilty-plea testimony. The overall jury charge was sufficiently comprehensive and instructive for the jury to assess witness credibility and did not in any way serve to lift the burden of proof on an essential element of an offense as defined by state law.

The circumstances here stand in stark contrast to the way such evidence was used in Bisaccia.  For example, the prosecutor did not use co-defendant guilty-plea testimony as substantive proof of the existence of a conspiracy.  The prosecutor, unlike in Bisaccia, did not attempt to impress the jury with the significance of a guilty plea during trial testimony, in an opening statement, in summation, or at any other time during the trial.  Rather, it was Davenport who most ably, during cross-examination, attempted to use that testimony to undermine witness credibility.  As the Appellate Division noted, the prosecution presented more than ample evidence to convict Davenport without that testimony.  (12-20-01 App. Div. Op. at p. 9.)  Thus, this Court finds no basis to conclude that the failure to provide a curative instruction was capable of producing an unjust result.  "To constitute the requisite denial of fundamental fairness sufficient to issue a writ of habeas corpus, the erroneously admitted evidence must be material in the sense of a crucial, critical, highly significant factor, and the probative value of the evidence must be so conspicuously outweighed by its inflammatory content that a defendant's constitutional right to a fair trial has been violated."  Peterkin v. Horn, 176 F.Supp.2d 342, 364 (E.D. Pa. 2001).  Here, Davenport as not made this showing.  Accordingly, this claim will be denied for being without merit.

C.    **Ineffective Assistance of Appellate Counsel**

Davenport argues that appellate counsel was constitutionally ineffective for failing to meet with Davenport to discuss issues for appeal, to raise the argument that the trial court erred in not giving an instruction on a deadlocked jury after the jury had been deliberating for some time, and to raise a claim that Davenport's rights were violated when Counts 9 through 17 were merged into one indictment.  (PCR Br. at pp. 34-35.)  Davenport raised these claims in his state PCR proceedings, and the state PCR court denied relief.  (11-3-06 PCR Tr. at 20:3-11.)  In an Opinion issued on July 24, 2008, the Appellate Division affirmed the denial of the PCR petition.

The "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), is the standard for ineffective assistance of counsel set forth in Strickland v. Washington, 466 U.S. 668 (1984).  A petitioner seeking to prove a Sixth Amendment violation must demonstrate that counsel's performance fell below an objective standard of reasonableness, assessing the facts of the case at the time of counsel's conduct.  See id. at 688-89; Jacobs v. Horn, 395 F.3d at 102.  Thus, a convicted defendant claiming ineffective assistance must identify counsel's acts or omissions that are alleged not to have been the result of reasonable professional judgment.  Strickland, 466 U.S. at 690.  The court must then determine whether, in light of all the circumstances at the time,

36

the identified errors were so serious as to be outside the wide range of professionally competent assistance. Id.

If deficient performance by counsel is demonstrated, then prejudice must be shown, i.e., a "reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial." Id. at 693. Thus, prejudice is shown if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. The reviewing court must evaluate the effect of any errors in light of the totality of the evidence. See id. at 695-96. Thus, the petitioner must establish both deficient performance and resulting prejudice to state an ineffective assistance of counsel claim. See id. at 697; see also Jacobs, 395 F.3d at 102. However, a district court need not address both components of an ineffective assistance claim if a petitioner makes an insufficient showing on one. Strickland, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id.

The Due Process Clause of the Fourteenth Amendment guarantees the effective assistance of counsel on a first direct appeal as of right.  See Evitts v. Lucey, 469 U.S. 387 (1985).  Ineffective assistance of appellate counsel claims are evaluated under the Strickland standard.  See Lewis v. Johnson, 359 F.3d 646, 656 (3d Cir. 2004).  Appellate counsel does not have a duty to advance every nonfrivolous argument that could be made, see Jones v. Barnes, 463 U.S. 745, 754 (1983), but a petitioner may establish that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).

To prevail on a claim that appellate counsel was ineffective, a petitioner must show not only that counsel's performance fell below an objective standard of reasonableness, but also that there was a reasonable probability, but for counsel's deficiency in raising the arguments on appeal, that the conviction would have been reversed on appeal.  See Buehl v. Vaughn, 166 F.3d 163, 173-74 (3d Cir. 1999).

This Court has reviewed the state court record and factual findings, and concludes that there is no merit to Davenport's claim of ineffective assistance of appellate counsel.  Indeed, this Court's review confirms that appellate counsel prepared a thorough brief on behalf of Davenport.

Davenport has not shown that his appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker."  Mayo, 13 F.3d at 533.  He has shown that counsel failed to raise certain non-meritorious claims that had no reasonable probability of reversing his conviction on appeal, given the ample and overwhelming evidence against Davenport at trial.  See Buehl, 166 F.3d at 173-74.  Therefore, this Court finds that Davenport's ineffective assistance of appellate counsel claim fails because he cannot demonstrate either deficient performance or any resulting prejudice.  Accordingly, this Court will deny this claim pursuant to 28 U.S.C. § 2254(b)(2), because it is without merit.

### D.   Pretrial Motion for Grand Jury Voting & Attendance Records

Davenport contends that he was denied the right of self-representation when the trial court kept him from arguing a pretrial motion for grand jury voting and attendance records.  The pretrial motion was heard by the Assignment Judge on August 21, 1998.  The court ruled as follows:

> Okay, Defendant Johnnie Davenport has filed the instant
> motion pro se, seeking an order to permit the release of
> Grand Jury voting and attendance records pursuant to Rule
> 3:6-5.[5]

---

[5]   N.J.Crim.Prac.R. 3:6-5 reads: "The Clerk of the grand jury shall make and keep minutes of the proceedings of the grand jury as well as a record of the vote of each juror, by name, on each considered matter. ...  The record of the vote on every count of every indictment and on every presentment shall be filed with the clerk of the grand jury.  The record shall not be made public except on order of the Assignment Judge."

Opposition has been submitted by the Monmouth County Prosecutor's Office.  Mr. Paul Escandon is present at the Court's request as he is acting in the capacity of legal assistant that was ordered by Judge Cleary, who has permitted Mr. Davenport to proceed pro se in this matter.

For the record, Mr. Escandon did not voice or set forth any arguments on Mr. Davenport's behalf.  He asked the Court for Mr. Davenport to be brought over.  The Court has declined, and exercised my discretion and declined his request.  There is nothing that Mr. Davenport can add.

This is the same pat answer with the same pat answers.  STATE versus DEL FINO.  If you read one, you read them all.  There is nothing, no indicia, and I am denying the application.

(8-21-98 Tr. at 5:6-23.)

Davenport raised this claim in his state PCR proceedings. Judge Cleary denied the claim summarily at the November 3, 2006, PCR hearing.  (11-3-06 PCR Tr. at 16:24-17:15.)  The Appellate Division affirmed without discussion.  (7-24-08 App. Div. Op.)

Deficiencies in state grand jury proceedings are generally not grounds for relief under § 2254.  See Lopez v. Riley, 865 F.2d 30, 32 (2d Cir. 1989).  This conclusion flows from United States v. Mechanik, 475 U.S. 66 (1986), which held that a violation of Fed.R.Crim.P. 6(d) (governing who may be present when grand jury is in session, deliberating, or voting), discovered only at trial, did not justify relief after the petit jury had rendered a verdict.  "[T]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt.  Measured by the petit jury's verdict, then, any error in the grand jury proceedings connected

40

with the charging decision was harmless beyond a reasonable doubt." Mechanik, 475 U.S. at 70 (footnote omitted); see United States v. Console, 13 F.3d 641, 671-72 (3d Cir. 1993) (with exception of claim of racial discrimination in selection of grand jurors, petit jury's guilty verdict renders harmless any prosecutorial misconduct before the indicting grand jury).

This Court rejects Davenport's claim that he was deprived of due process when his application for grand jury records was denied, as he shows no basis for this claim.  This Court finds no error of constitutional dimension as to this habeas claim concerning grand jury records.  Moreover, Davenport's attempt to color this claim as a denial of self-representation also fails. The record shows that the Assignment Judge did not allow Davenport present oral argument on this motion because the application was baseless and there was nothing that Davenport could have added at a hearing.  It was a perfunctory denial on the papers because the application did not merit argument.

**E.   Failure to Disclose Confidential Informant**

Davenport argues that he was denied the right to disclosure of the informant used in the procurement of the search warrant. Davenport claims that the informant was not proven or established as reliable in the past.  This claim apparently was not raised until Davenport's state PCR proceedings, where it was couched in terms of ineffective assistance of appellate counsel.  In ruling

41

against Davenport, the PCR court stated: "Again, there is an
argument that I refused his -- I denied his motion to disclose
the identity of the informant.  That could have been brought up
at trial and it could have been brought up on appeal.  It wasn't.
So therefore he cannot argue that." (11-3-06 PCR Tr. at 19:15-19.)

On appeal from denial of the PCR petition, the Appellate
Division stated:

> Defendant raises two additional items with respect to his
> appellate attorney, that he did not raise on appeal, the
> trial court's denial of his motion to disclose confidential
> informants, nor did he raise the fact that the assignment
> judge, who handled defendant's motion for release of grand
> jury minutes and voting record did so without defendant being
> present.  We note that when defendant raised this issue
> before the trial court, he did so in the context of arguing
> ineffective assistance of trial counsel (although defendant
> was proceeding pro se) and not in the context of ineffective
> assistance of appellate counsel.  In any event, we are
> satisfied that defendant is unable to satisfy the second
> prong of the test for ineffective assistance of counsel, a
> reasonable probability he would have prevailed on appeal.

(7-24-08 App. Div. Op. at pp. 6-7.)

This Court, upon review of the trial record and state court
decisions, concludes that Davenport has failed to support this
claim for habeas relief.  He has not satisfied the first prong of
deficient performance by appellate counsel, as he has not shown
that his appellate counsel "omitted significant and obvious
issues while pursuing issues that were clearly and significantly
weaker."  Mayo, 13 F.3d at 533.  He simply, without support,
argues that counsel failed to raise this claim on direct appeal.

As observed by the state court, Davenport also has not met the second prong of an ineffective assistance of counsel claim, since he fails to articulate that this particular claim would have had a reasonable probability in reversing his conviction on appeal, especially in light of the ample and overwhelming evidence against him at trial.   See Buehl, 166 F.3d at 173-74.

This Court finds that the decision of the state courts as to this ineffective assistance of counsel claim was neither contrary to, nor an unreasonable application of, clearly-established federal law as set forth above, nor was it based on an unreasonable determination of the facts in light of the evidence presented.   Davenport has not met his burden, and thus this claim will be denied for being without merit.

**F.   Denial of Request for an Investigator**

Davenport contends that the trial court erred in denying his request for an investigator, and in denying his request that standby counsel take over his defense when the request for an investigator was denied.   Again, he presented this claim in the context of an ineffective assistance of appellate counsel claim in his state PCR proceeding.   The PCR court addressed Davenport's claim as follows:

> As to not being able to -- as the Court not granting him an
> investigator, again, he decided to represent himself.   I
> can't order the public defender or anyone else to
> investigate matters for him.   That was up to himself.   So he
> had to mount his own defense.

(11-3-06 PCR Tr. at 19:10-14.)

43

On review from denial of the PCR petition, the Appellate Division held:

> Defendant appeared before the trial court on August 18, 1998, accompanied by stand-by counsel.  During the course of the proceedings that day, the trial court handled a number of motions.  At the end of the day, defendant asked the trial court to appoint an investigator to aid in his defense.  The trial court noted that it had previously told defendant that it could not direct the public defender's office to appoint an investigator for defendant and that if defendant felt he required the assistance of an investigator, he had to make application to the public defender's office.  Defendant then asked for his stand-by counsel to "be put back in charge" of his defense.  The trial court instructed defendant that if he wished that, he again had to make application to the public defender's office.  The trial court told defendant that if the public defender's office granted that request, there was no assurance that it would name stand-by counsel to take over the defense.  Defendant never followed through with an application to the public defender's office, however.  Defendant cannot burden the trial court with the consequences of his own inaction.
>
> . . .
>
> As we have indicated, the record does not bear out the complaint that the trial court denied him access to investigative services.  Accordingly, his appellate counsel cannot be considered ineffective for not raising the issue on direct appeal.

(7-24-08 App. Div. Op. at pp. 4-5.)

This Court, upon review of the trial record and state court decisions, concludes that Davenport has not satisfied either element necessary to support an ineffective assistance of appellate counsel claim.  The record does not corroborate Davenport's contention that the trial court denied his request for investigative services.  Rather, Davenport neglected to apply to the public defender's office as the trial court informed him that was the proper procedure to obtain investigative assistance.

44

Therefore, this Court concludes that the decision of the state courts as to this claim was neither contrary to, nor an unreasonable application of, clearly established federal law, as set forth above, nor was it based on an unreasonable determination of the facts in light of the evidence presented. The claim will be denied for being without merit.

**G.   Trial Court's Alleged Verbal Attack**

Davenport alleges that the trial court verbally attacked him in a pretrial hearing to sanitize a letter.  Davenport raised this claim in his state PCR proceeding.  In a February 9, 2007 hearing to amplify the PCR record, the PCR court stated:

> . . . one of the issues that was set forth in his petition concerned me, and that was that the record showed that the defendant was called Mr. Airhead -- and it's Mr. "A-i-r-h-e-a-d" -- by the Court, and that showed on a transcript dated February 9, 1999.
>
> It was a transcript, it was on page four of that transcript. And it was during a hearing outside the presence of the jury.  I was rather concerned, and I just could not figure out how I had ever used that phrase.  And I was concerned about that.  I found that that didn't make a difference; that it was part of the record, it was part of the record. But that this phrase, if stated, was made outside the presence of the jury, and therefore the defendant was not prejudiced by the remark.
>
> He argued that by calling him such a name affected his confidence, and it did not allow him to feel confident in his own ability to mount a proper defense, although he had standby counsel to assist him.  So, but I did find that that was not a reason to grant his petition for postconviction relief.
>
> Subsequently, I found a transcript that had never been supplied to the Court for that hearing.  And that transcript was dated February 4, 1999.  And it appears that that was a pretrial hearing before the jury was ever selected.

And on February 4, 1999, seems like the whole day was spent
on pretrial motions. One of those motions was to redact
certain letters written by Mr. Davenport. And it seems that
Mr. Davenport had written certain letters. I believe they
had gone to certain people in jail, to his attorneys, to the
prosecutor. He had written letters using language that was
-- we say swear words -- and other language using derogatory
remarks. And we sought to redact certain parts of those
letters. Also the letters referred to the fact that he was
in jail or that people were in jail, and he had been
convicted of crimes at another occasion, and I didn't feel
that that was right to have, if he was going to use those
letters in his defense or the prosecutor is going to use
those letters in any way, that some of those statements
should not be heard before the jury.

So we spent a better part of a day, and that was February 4,
1999, which was a Thursday, going through those letters and
deciding what to let in and not, what to delete, and we went
through them. So that was the February 4th. That
transcript was never supplied to the Court.

The transcript that we did have was supplied at the
postconviction relief for the postconviction relief hearing,
and the comment that was called to by defendant was on page
four of that transcript. And it said -- I'll just read part
of page four.

"THE COURT: Mr. Davenport, it is a two-page letter dated I
think September 19th.
"MR. DAVENPORT: Yes.
"THE COURT: Does it start out with piece?
"MR. DAVENPORT: That letter from blank to me. But in the
course of this letter I sent it back to him with writing
from me on it and I took that out.
"THE COURT: Well, Mr. Airhead, you took it out.
"MR. DAVENPORT: Yes. If Mr. Peppler wants to use it he can,
but in my defense I'm using a letter sent from Mr.
Crawford."

And I have determined that the phrase "Mr. Airhead" was used
by Mr. Davenport, and that in this colloquy between myself
and Mr. Davenport, I am asking Mr. Davenport if he wants
that part deleted from the letter, if it is ever used before
the Court. So that's the answer to the "Mr. Airhead" phrase.
I never used the words Mr. Airhead in referring to Mr.
Davenport. Mr. Davenport used it when he wrote a letter.

(2-9-07 Tr. at 4:2-7:2.)

46

On appeal from denial of post-conviction relief, the

Appellate Division held:

> His second complaint with respect to his appellate attorney requires a further explication of the record.  The transcript of February 9, 1999, contains the following statement by the trial court addressed to defendant, "Well, Mr. Air Head, you took it out?"  Defendant contends that his appellate attorney was ineffective for not arguing on his direct appeal that this statement, made outside the presence of the jury, indicated the trial court was biased against him.

> We agree with the trial court that the record, taken as a whole, does not support defendant's position.  It is clear that the colloquy on February 9, 1999, was a continuation of the hearing of February 4, 1999, when there was a discussion of what redactions, if any, should be made to certain letters by defendant before they could be used before the jury.  Seen in its proper context, it is clear that the trial court was asking defendant whether he had deleted the phrase, "Mr. Air Head," and was not using that term with reference to defendant.

(7-24-08 App. Div. Op. at p. 6.)

This Court is satisfied from review of the state court

decisions as set forth above that there is was no error on the

part of the trial court or Davenport's appellate attorney as to

this claim.  The colloquy at issue was made outside of the jury's

presence.  Also, the comment was not a reference to Davenport, but

instead a reference to what Davenport may have wanted redacted

from his letter.  Consequently, there is no merit to Davenport's

argument, and this claim will be denied.  Davenport has failed to

show that the state court determination "resulted in a decision

that was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme

Court of the United States," or "resulted in a decision that was

based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." <u>Williams</u>, 529 U.S. at 412-13.

## V.   CERTIFICATE OF APPEALABILITY

This Court next must determine whether a certificate of appealability should issue. <u>See</u> 3d Cir. L.App.R. 22.2.  The Court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For the reasons discussed above, this Court's review of the claims advanced by Davenport demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue.  Thus, this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

## CONCLUSION

The § 2254 habeas petition will be denied, and a certificate of appealability will not issue.  The Court will issue an appropriate order.

s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

Dated:    July 11, 2012

48